UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  09-60202-CV-COHN

THE CONTINENTAL GROUP, INC.,

Magistrate Judge Seltzer

Plaintiff,

vs.

KW PROPERTY MANAGEMENT, LLC d/b/a KW
PROPERTY MANAGEMENT AND CONSULTING, LLC;
KW HOLDING ONE, LLC d/b/a KW PROPERTY
MANAGEMENT AND CONSULTING, LLC; THE GRAND
PRESERVE AT NAPLES LLC d/b/a KW PROPERTY
MANAGEMENT AND CONSULTING, LLC; and
MARCY KRAVIT,

Defendants.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**ORDER GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION**
_____

_____THIS CAUSE is before the Court upon Plaintiff's Motion for a Preliminary

Injunction [DE 3], Defendants' Motion to Dismiss [DE 57], Plaintiff's Motion to Strike

Affidavit [DE 100], Plaintiff's Motion for Adverse Inference or Injunction due to

Spoliation [DE 102/104], Plaintiff's Motion to Amend and Supplement Preliminary

Injunctive Relief [DE 128], and Plaintiff's Motion to Strike Supplemental Memorandum

[DE 146].  The Court has carefully considered the motions, responses, replies, the

argument of counsel and the evidence presented on March 26, 2009 and April 2, 2009,

including the credibility of witnesses, and is otherwise fully advised in the premises.

I.  BACKGROUND

The parties are competitors in the condominium property management business

in Florida.  Plaintiff The Continental Group ("TCG" or "Plaintiff") alleges that Defendants KW Property Management, Inc., KW Holding One, LLC, The Grand Preserve at Naples LLC (collectively, the "KW Defendants")[1] hired away Defendant Marcy Kravit from TCG and that acting as an agent of the KW Defendants she downloaded proprietary information from Plaintiff's computer system prior to her departure.   Several other employees of Plaintiff were hired away as well though they are not named as Defendants in this action.

Plaintiff's Verified Complaint contains claims for violations of the Computer Fraud and Abuse Act ("CFAA") (Count I) against all Defendants, breach of restrictive covenant contracts against Kravit (Count II), tortious interference against all Defendants as to customer relationships (Counts III), tortious interference against the KW Defendants for interfering with the restrictive covenant agreements between Plaintiff and Kravit (and other former TCG employees) (Count IV), and misappropriation of trade secrets (Count V).

The Court granted Plaintiff's motion for expedited discovery prior to the evidentiary hearing on the preliminary injunction motion.  Plaintiff's computer forensic expert was allowed to image Defendants' computers, resulting in some document production following a privilege review.  During a March 9, 2009 hearing on discovery matters, Plaintiff's counsel represented at that time that a preliminary injunction was not being sought as to Count III regarding tortious interference with customers, but rather

---

[1]  As discussed later, the Court is dismissing Defendants KW Holding One, LLC, The Grand Preserve at Naples LLC.  When the Court refers only to KW Property Management, Inc., it will be called "KW."

on the CFAA claim, the breach of contract claim, and the tortious interference claim as it relates to the restrictive employee covenants.  However, Plaintiff sought to broaden the scope of injunctive relief on the eve of the hearing.  As a preliminary matter, even if there were competent evidence to support such relief, the Court concludes that it would be improper to base an injunction on customer interference.

## II.  FINDINGS OF FACT[2]

### A.  Kravit's employment with TCG

1.     Throughout her employment with TCG, Defendant Kravit was subject to the "Non-Solicitation, Non-Competition, Anti Kick-Back and Confidentiality Agreement" she signed when she began her employment.  Plaintiff's Exhibit 132.

2.     Defendant Kravit did not effectively resign from TCG's employ during March of 2007.

3.     Kravit's present position with KW Property Management is one that is engaging in property management services, even though she personally does not work at any particular property.

### B.  Defendant Kravit copied and removed voluminous electronic files from TCG

4.     Plaintiff's computer forensic expert, James S. Wilson, testified at length

---

[2]  The Court has received proposed findings of fact from each party.  These documents have been filed in the docket of this case and served on all opposing parties [DE's 141, 142, and 144].  Due to the detailed nature of the evidence in support of the preliminary injunction motion, the Court does incorporate verbatim certain portions of Plaintiff's Proposed Findings, though this Court has made an independent judgment that these findings are correct.  Cf. Bright v. Westmoreland County, 380 F.3d 729 (3rd Cir. 2004).

regarding his investigation of Defendant Kravit's access to TCG's computer system and the "metadata"[3] evidence that she downloaded voluminous files that ended up on her personal laptop, her personal portable data storage devices, her KW laptop and some on the KW servers. The Court found his testimony credible and has relied upon it extensively in these findings of fact.

5.      The cost of Wilson's investigation of the extent and effect of Kravit's alleged unauthorized access exceeded $5,000.

6.      There was no evidence that Defendant Kravit caused any damage to TCG's computer system, nor did her actions cause an interruption in service.

7.      Beginning at least by November 18, 2008 and continuing up to her resignation from TCG on December 11, 2008, Defendant Kravit accessed and copied to electronic devices or e-mailed to her personal e-mail account, voluminous electronic files and data belonging to TCG.

8.      Kravit testified that she routinely downloaded documents onto portable data devices for work purposes in preparation of working on-site at a property or from home.  Kravit stated under cross-examination that she would highlight and copy many files at one time, which was easier than just picking out the files she needed.

9.      In late November and early December of 2008, up until the time of her resignation on December 11, Kravit was helping prepare a presentation for

---

[3] "Metadata" is data regarding the properties of a document, including when it was created, last modified, deleted, etc.

4

renewal of TCG's management contract with the Sunset Harbor South condominium.

10.     On November 18, 2008, Defendant Kravit created on one of her several USB devices, the "Becker" device, approximately 1,350 files and folders, reasonably appearing to be comprised almost entirely of TCG files and data.  From the path name, the files came from folders for TCG properties, including: Marquis, North Tower at the Point, Opera, Jade Beach, Meridian, Governor, Atlantic I, Bentley Bay, Grand Venetian, Costa Brava, Sunset Harbour North, Sunset Harbour South, Infinity, Island Terrace, 50 Biscayne, Trump Tower and 5600 Condominium.  Plaintiff's Exhibit 5.

11.     Other folders and files copied to the Becker device on that day include items from a "job duties" folder (including line 173, job duties-Asia Janitor Housekeeping duties tasks), a "resumes" folder (including line 258, a resume for "Carolina", and line 1110, a resume for Carlos Rodriguez, the property manager at Grovenor House, see P21 attachment).  Id.

12.     Still other folders and files copied to the Becker USB device – one of the devices produced for imaging by Defendant Kravit – included a Continental business plan (line 307), leadership development program timeline (line 797), a startup folder (including lines 976 through 978, "pedro" startup documents for conversions, existing properties and new developments), a green council folder (including subfolders on "education" and "presentations" such as TR –sustainability initiative and greening the office), a budget folder (including line

5

1303, the file "understanding financials participant handbook") and a Venetian Isle cost comparison file at line 1322.  <u>Id.</u>

13.    On still another of Defendant Kravit's portable electronic USB devices produced for imaging, the Datatraveler or Kingston USB device, are approximately 2,432 files and folders, also appearing to be comprised substantially of TCG files and data.  On this device are included files from a folder titled "Al Blake" (including a file titled prospective property proposals and a separate folder on proposals).  Plaintiff's Exhibit 7.

14.    This Datatraveler or Kingston device produced by Defendant Kravit for imaging contains approximately 1,464 files created on the device and last accessed on the device on November 18, 2008.  The device also contains 42 files last accessed and created on the device on December 9, 2008, two days prior to Kravit's resignation.  Also on the device are 147 files last accessed on the device on December 10, the day before Kravit's resignation, and which were created on the device on December 9, including a file titled "TCG servicers vs costs – Costa Brava."  <u>Id.</u>

15.    The Kingston device contains numerous files last accessed on December 22, 2008, during the course of Kravit's employment with the KW Defendants, but which files were created on the device on December 9, 2008, while Kravit was still employed with Plaintiff TCG.  These files include 5,600 condominium – cost comparison template, Continental business plan, FD [front desk] wages spreadsheet, and Pappas team contact information updated 10-3-07.  <u>Id.</u>

16.     Particular files on the Kingston device include district manager checklist (2) (line 923), last written August 22, 2008 (meaning written elsewhere and not on the device on that date), but created on the device on December 23, 2008 and last accessed on February 14, 2009 after Kravit had been served with this lawsuit. Id.

17.      Also last accessed on the Kingston device on December 23, 2008 are files "greening the office," and the "pedro" startup checklists.  Thirty-six files on the Kingston device were last accessed after Kravit had been served with this lawsuit, on February 14 or 18, 2009.  Id.

18.     Kravit testified on direct examination that she opened these files after knowledge of the lawsuit and before turning the devices over to counsel because she wanted to see if they were her flash drives or those of her adult children.  She disclaimed any knowledge of her actions changing the "metadata" of these files. On cross-examination, she conceded that she wanted to know what she was turning over.  However, her instructions were not to delete or modify the files.

19.     Another of Kravit's portable external devices, her verbatim drive, contained over 27,000 files, most appearing from their file or folder names to constitute materials from TCG.  See Plaintiff's Exhibit 13.  Many of these were last accessed on December 4 and 5, 2008, within days of Kravit's resignation from TCG.

## C. Kravit removed TCG files which she had no business purpose accessing at TCG

20.     Among the sampling of files obtained to date by Plaintiff from Kravit's personal computer and electronic devices are files that Defendant Kravit had no business purpose in accessing, copying and removing during the month preceding her resignation and which therefore Kravit was not authorized to access, copy and remove according to TCG's written policies governing computer systems and company property.  Plaintiff's Exhibit 136.

21.     The "TCG Mgmt Broward 2009 Budget" draft document was placed on Defendant Kravit's cruzer titanium USB device on October 7, 2008 during her employment with TCG, but was last accessed on that device on February 14, 2009, after Kravit had been served with this lawsuit.  Plaintiff's Exhibit 1 and Plaintiff's Exhibit 6 (showing last accessed and file created dates on cruzer USB device).

22.     That same file is contained on Defendant Kravit's personal Dell laptop.  It was last accessed on that laptop on November 18, 2008, was modified on December 20, 2008, and was interacted with between her personal laptop and her cruzer USB device on February 14, 2009.   Plaintiff's Exhibit 2.

23.     That same file is accessed and last written from Kravit's personal laptop to her external verbatim drive on February 14, 2009 as well.  Plaintiff's Exhibits 3 and 4.

24.     During cross-examination, Kravit did not provide an explanation of her access to this document, other than she "often looks at files."

8

25.   Defendant Kravit had no business purpose in accessing, copying or removing this file from TCG, a file that she was not granted access rights to in TCG's computer system and which was a highly confidential "roadmap" to TCG's business in Broward County.

26.   Defendant Kravit also accessed, copied and removed numerous files and folders pertaining to TCG's sustainability or "green" initiative.  Plaintiff's Exhibits 15, 16 and 17.  However, Kravit testified that she helped develop the materials upon the request of Michelle Joyu and had written articles for the Community Association Institute.  Plaintiff's Exhibit 14.

27.   The properties information on certain of these materials taken by Kravit demonstrate that she was not the author of the materials.  Plaintiff's Exhibits 14, 18, 19, and 20.  TCG President Steven Titleman testified that these materials were created in partnership with First Management Partners ("FMP"), TCG's majority shareholder, through on-line conferencing and collaboration in which Kravit did not participate.   FMP is based in a state other than Florida.

28.   These materials are proprietary because of the labor involved in preparing the materials and because such materials had not yet been disclosed outside of TCG.

29.   Defendant Kravit accessed, copied and removed a contact and client information listing for the team of Chris Pappas, in the greater Palm Beach region, a geographic area and team with which Kravit had no responsibilities.  Plaintiff's Exhibit 87.  The compiling of this contact and client information into a single

document is of significant value to competitors, including KW, as it saves a competitor the labor cost of compiling the information.

30.     As yet another example, Defendant Kravit accessed and removed a contract template created by TCG for fixed fee contract bidding, as well as a particular contract bid for the Apogee property using that fixed fee template.  Plaintiff's Exhibits 74 and 78.  The template was created by TCG for its use in contract matters and was confidential and proprietary to TCG.

### D. Kravit removed and accessed files relating to the solicitation of TCG employees

31.     Defendant Kravit's portable electronic devices contain at least three folders for "resumes."  Plaintiff's Exhibit 103 represents seventy-two (72) resume-related files identified on Defendant Kravit's personal laptop.  Some of those resumes were for Angela Sparks (entry modified, such as by changing an extension, on December 20, 2008), Frank Daire (entry modified on January 10, 2009), and Ed Magdycz (entry modified on January 26, 2009).

32.     Plaintiff's Exhibit 102 represents 49 resume-related files identified in another folder on Defendant Kravit's personal laptop.  Some of those resumes were for Brian Seidler (last accessed December 5, 2008, entry modified December 20, 2008), Dwight Lyons (same last accessed and entry modified dates), and Greg Johnson (same).

33.     Plaintiff's Exhibit 104 represents ten (10) resume-related files on Defendant Kravit's personal laptop.  Among the files accessed in that folder on December

20, 2008 are resumes for building engineers.

34.   Kravit testified that since leaving TCG, she has been approached by twenty or more TCG employees, but she has never solicited them to work for KW and has told these employees she cannot do that.

35.   Kravit had signed a non-compete and non-solicitation restrictive covenant upon her commencement of employment with Plaintiff.  Plaintiff's Exhibit 132.

36.   Despite her submission of her resignation letter to TCG on March 5, 2007, Kravit never left the employ of TCG.  After March 5, 2007, she remained out on personal leave prior to her stated effective resignation date.  Just prior to the date she stated in her own letter, Kravit accepted a promotion from TCG and continued her employment.  Although no new non-compete agreement was signed, the original non-compete remained in effect.

### E. Kravit and the KW Defendants engaged in activities in violation of Kravit's prohibition on solicitation of TCG employees

37.   As noted, despite Kravit's testimony, the exhibit evidence shows that Defendant Kravit accessed and used resumes she had collected in the course of her employment at TCG to identify and promote potential candidates for employment with KW.  Kravit provided information on qualifications, contact information, recommendations as well as resumes to her colleague at KW, Ed Cox, as well as to KW principals Paul Kaplan and Robert White.  Plaintiff's Exhibits 92-100, and 105-109.

38.   Kravit also got involved in setting up interviews for candidates, including

candidates from TCG such as Rosie Klee.  Plaintiff's Exhibit 101.

39.     On at least one occasion, Kravit asked that her email forwarding a resume

should be deleted.  Plaintiff's Exhibit 106.  On another occasion, she asked that

her name not be mentioned as the source of a solicitation or the resume.

Plaintiff's Exhibit 105.

### F. The KW Defendants knowingly interfered and continue to interfere with enforceable restrictive covenant agreements of Defendant Kravit

40.     KW Property Management was aware that Kravit had a restrictive covenant

agreement with TCG and expressly acknowledged the existence of that

agreement in the employment contract signed with Kravit.  Plaintiff's Exhibit 48.

41.     KW was and is aware that Kravit's restrictive covenant agreement, as well as the

agreements of former TCG employees Niemeier and Seidler, prohibit their

current employment with KW.  Declaration of Robert C. White, ¶ 4 [DE 70].

42.     KW's own proposed restrictive covenant agreement contains non-competition,

non-solicitation and confidentiality provisions, and states that those restrictions

are supported by legitimate business interests in the property management

business.  Plaintiff's Exhibit 46.

43.     Defendant Kravit's attorney in turn – the same counsel as is representing

Defendant Kravit in this action – proposed an alternative contract of employment

and restrictive covenant agreement containing the same recitations regarding

legitimate business interests and noncompetition, non-solicitation and

confidentiality as had been proposed by KW through its counsel.  Plaintiff's

Exhibits 46, 47, 48, 130, and 131.

44.   Prior to her resignation, Kravit provided a copy of her TCG restrictive covenant agreement to the KW principals, Paul Kaplan and Robert White, as well as their attorney Frank Simone, who is co-counsel for the KW Defendants in this action. Plaintiff's Exhibit 131.

45.   The KW Defendants agreed in the employment agreement with Defendant Kravit to indemnify Defendant Kravit to the full extent permissible by law for any litigation arising over Kravit's restrictive covenant agreement with TCG. Plaintiff's Exhibit 48.

### G. Defendants have used and disseminated valuable confidential business information removed by Kravit and Niemeier from TCG

46.   Defendant Kravit has disseminated, and has insisted upon the use of by all property managers and district managers at KW, certain forms, processes, methodologies and procedures created and refined over the years by TCG. These include startup checklists, preventative maintenance schedules, District Manager checklists, job descriptions, and other housekeeping and maintenance schedules and descriptions, all of which Kravit took from TCG and is using and disseminating at KW.  Plaintiff's Exhibits 56-62.

47.   TCG customer or client goodwill associated with TCG's ongoing business is damaged by the use of these forms, methods, and processes by KW because of the effort and labor expended by TCG in preparation of these materials, which KW is now using without having to expend such labor.

48.    These forms, metholodogies, processes, and schedules have been
disseminated not only by e-mail but by the use of Kravit's USB device in KW
computers used by individuals other than Kravit, and by redirection from Kravit's
KW computer into the KW server itself.

49.    For example, Plaintiff's Exhibit 36 shows that Marlene Niemeier, former TCG
manager and currently a KW district manager with responsibility over the
Marquis condominium, accessed on her KW laptop Marcy Kravit's Kingston USB
drive and certain TCG files contained on that drive after Kravit had gone to work
at KW.

50.    Kravit's Kingston device was also used with Kravit's KW laptop.  Plaintiff's
Exhibit 38.  Files accessed by Kravit from the Kingston device on her KW laptop
included the startup checklists, the new community startup letter, and the
understanding financials participant workbook obtained from FMP.

51.    Kravit's Kingston device was used with her personal Dell computer as well.
Plaintiff's Exhibit 42.  Kravit's Kingston device was used to take files from TCG
using the laptop assigned to Kravit.  Plaintiff's Exhibit 43.

52.    The properties on the templates and schedules show them clearly to be TCG
files taken by Kravit shortly before her resignation from TCG.  For example,
Plaintiff's Exhibit 57, the  Asia Janitor document, shows in its metadata
properties summary that it is a TCG-created document.  Plaintiff's Exhibit 59.
District Manager ("DM") checklist (2), shows it also is a TCG-created document.

53.    That the information taken was valuable to Kravit, Niemeier and KW is

demonstrated by the fact that the information was accessed and in some cases transferred to a KW server or KW computer.  Defendant Kravit required her new subordinates that forms for each property derived from TCG forms be uploaded to the KW server.  Plaintiff's Exhibit 62, 56, and 68.

54.  Plaintiff's Exhibit 125 shows some examples of files that were transmitted from Kravit's KW laptop to the KW server and were clearly taken from TCG. Plaintiff's Exhibits 127 and 128 show files accessed by Niemeier from her KW laptop, including files on an external device not produced for imaging but whose path name contains a directory or folder on the device for Marcy Kravit.

55.  Among the documents taken from TCG by KW and used by KW are TCG's hurricane procedures.  KW's hurricane procedures template for high-rise buildings is taken directly from TCG's hurricane procedures document.  The KW procedures document identified as the "template" has properties showing it was created by the same individual as TCG's document.  Plaintiff's Exhibits 27, 28 and 29.

56.  Defendant Kravit accessed, copied and removed voluminous files and folders relating to hurricane preparedness during the month and days prior to her resignation from TCG and accessed those files during her employment with KW. Plaintiff's Exhibits 31-34.

57.  This information taken by Kravit and Niemeier, and used throughout KW, is not limited to Broward and Miami-Dade Counties.  For example, Plaintiff's Exhibits 35 and 43 show Kravit took files pertaining to Grand Shores, TCG's property

15

management division in the Florida Panhandle.  Plaintiff's Exhibit 109 shows Kravit was involved in filling positions in Highland Beach, Florida, and was attempting to do so with a TCG employee, Dwight Lyons.  Plaintiff's Exhibit 87 contains contact information and property listings for properties managed in the areas around West Palm Beach and Daytona.

### H. Kravit was at all pertinent times an agent of KW Property Management

58.   Although Kravit testified that no one at KW ever asked her to copy files from TCG, KW would not have had the voluminous and valuable information it has utilized without hiring Kravit.  KW principals acknowledged this purpose on November 18, 2008, the date of an apparent acceptance by Kravit of a position with KW and the date that Kravit copied voluminous files from TCG onto more than one USB device and which she later accessed following her resignation and during her employment with KW.  Plaintiff's Exhibit 129.

59.   Kravit's conduct was subsequently acquiesced in by KW as the KW principals were knowing participants in communications involving TCG documents and about solicitation of TCG employees.

60.   Kravit's position with KW was announced on December 8, 2008, three days prior to her resignation of employment from TCG and prior to her downloading of numerous files from TCG on December 9 and 10, 2009.  Plaintiff's Exhibit 45.

61.   Kravit testified that following KW's offer of a regional manager position in late October of 2008, which she rejected, she turned over negotiation of a better position with KW to her attorney and her husband.  Kravit's testimony that a deal

16

was not finalized until the evening of December 10, 2008, is not credible in light
of the KW internal announcement of December 8, 2008 (Plaintiff's Exhibit 45),
and the email between KW principals on November 18, 2008 regarding the
taking away of TCG's clients.  Plaintiff's Exhibit 129 (though no specific mention
of Marcy Kravit).

62.     There is no credible evidence linking Defendants KW Holding One, LLC and
        The Grand Preserve at Naples, LLC to Marcy Kravit's actions or the property
        management business of KW Property Management, Inc.


### III.  CONCLUSIONS OF LAW

### A.  Preliminary Injunction Standard

In order to obtain a preliminary injunction, TCG must establish the following four
elements: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial
threat that it will suffer irreparable injury if the injunction is not granted; (3) the
threatened injury to plaintiff outweighs the threatened harm the injunction may do to the
defendants; and (4) granting the preliminary injunction will not disserve the public
interest.  Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994).  Because a
"preliminary injunction is an extraordinary and drastic remedy," it is "not to be granted
until the movant clearly carries the burden of persuasion as to the four prerequisites."
Id. (quoting Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of
Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)); see also McDonald's Corp. v.
Roberts, 147 F.3d 1301, 1306 (11th Cir. 1998).

TCG seeks a preliminary injunction to force the KW Defendants to be restrained from retaining or using any TCG confidential information, that the KW Defendants' computers should be "wiped clean," as Defendants cannot be trusted not to use the information to solicit clients in the future, that Defendants should terminate the employment of Defendant Kravit, as well as three other non-party employees, and that Defendant Kravit be enjoined from working in the property management field in Florida. Defendants argue that TCG is simply trying to restrain their competition, that Defendant has already agreed not to use any of TCG's information, and that the claims should be dismissed for failure to state a claim.

### B.  Motion to Dismiss Standard

At the opposite end of the burden spectrum, the Court is also deciding Defendants' Motion to Dismiss for failure to state a claim and for lack of subject matter jurisdiction.  The Court previously ruled that because the merits of TCG's CFAA claim are intertwined with the subject matter jurisdiction question, the Court would hear the preliminary injunction motion at the same time as the motion to dismiss.  Pursuant to the United States Supreme Court decision in Bell Atlantic Corp. v. Twombly, 550 U.S. —, 127 S.Ct. 1955 (2007), to survive a motion to dismiss for failure to state a claim, a complaint must now contain factual allegations which are "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."  127 S. Ct. at 1965.  Taking the facts as true, a court may grant a motion to dismiss when, "on the basis of a dispositive issue of law, no construction of

18

the factual allegations will support the cause of action." <u>Marshall Cty. Bd. of Educ. v.</u> <u>Marshall Cty. Gas Dist.</u>, 992 F.2d 1171, 1174 (11th Cir. 1993).  On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court may weigh the competing facts brought forth by the parties.


## C.  CFAA Claim

Plaintiff asserts that a preliminary injunction should issue based upon the CFAA claim because Defendant Kravit, acting as an agent of the KW Defendants, exceeded her authority and access to TCG's protected computers, causing loss or damage in investigation and remediation costs in excess of $5,000.  The CFAA authorizes a civil action by one "who suffers damage or loss by reason of a violation of this section . . . against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  18 U.S.C. § 1030(g).

The alleged violations in this case are: (1) That Kravit "intentionally access[ed] a computer without authorization or exceed[ed] authorized access, and thereby obtained information from any protected computer" (18 U.S.C. § 1030(a)(2)(c)); and (2) Kravit "knowingly and with intent to defraud, access[ed] a protected computer without authorization, or exceed[ed] authorization, and by means of such conduct furthers the intended fraud and obtains anything of value. . . ."  18 U.S.C. § 1030(a)(4). Defendants raise several arguments in opposition to Plaintiff's assertions in both their motion to dismiss and opposition to the preliminary injunction motion.

1.  "Protected Computer"

Defendants argue that because TCG only does business in Florida, Plaintiff

cannot show an interstate commerce nexus to their protected computer.[4]  A "protected

computer" is defined as a computer "which is used in or affecting interstate or foreign

commerce or communication. . . ."  18 U.S.C. § 1030(e)(2)(B).  The KW Defendants

assert that the TCG computer system only connects TCG offices within the state of

Florida and does not affect interstate commerce.  Plaintiff relies on case law stating that

any connection to the Internet is part of an interstate communication systems.  United

States v. Trotter, 478 F.3d 918, 921 (8th Cir. 2007); Paradigm Alliance Inc. v. Celeritas

Technologies, LLC, 248 F.R.D. 598, 601 (D. Kan. 2008).  Defendants argue that

Congress could not have intended so broad a reach, and limited jurisdiction to

computers used in interest commerce.  Nordstrom Consulting, Inc. v. M & S

Technologies, Inc., 2008 WL 623660 (N.D. Ill. Mar. 4, 2008).

There is a split of authority on this issue, but the greater weight of authority

favors Plaintiff on this issue.  A connection to the internet is "affecting interstate

commerce or communication."  18 U.S.C. § 1030(e)(2)(b).  In addition, the evidence

showed that TCG uses its internet connection to communicate with First Management

Partners, its largest shareholder, who is based in a state other than Florida, particularly

in connection with development of its green initiative.  On the issue of whether TCG's

computer is a "protected computer," not only can Plaintiff defeat Defendant's motion to

---

[4]  Plaintiff alleges that its former employee, Defendant Marcy Kravit, acted as an
agent for the KW Defendants when she accessed Plaintiff's computer system while
exceeding her authorization for such access.  Complaint, ¶¶ 39, 45, 47 and 61.

dismiss as there is more than enough evidence to raise its claims beyond a speculative level, but Plaintiff has shown a substantial likelihood of success that its computers are in fact "protected computers" under the CFAA.

### 2. $5,000 Jurisdictional Limit

A civil action under the CFAA may only be brought if it involves a loss aggregating at least $5,000 in value.  See 18 U.S.C. § 1030(g) (referring back to §1030(c)(4)(A)(I).  Thus, a plaintiff must show "damage" or "loss" of at least $5,000. The evidence is clear that Plaintiff has paid over that amount to its computer forensic consultant to investigate the integrity of its computers following Kravit's alleged unauthorized access.  Defendants argue that this cost is insufficient to meet the jurisdictional threshold absent evidence that the computers themselves were damaged, or that any "loss" must be the result of an interruption of service.

Loss is defined in the CFAA as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, **and** any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11) (emphasis added).  The key question here is whether there are two ways of determining loss, one before the "and" that is not modified by "interruption of service," and one after wherein any loss must be the result of interruption of service.  In Cohen v. Gulfstream Training Academy, 2008 WL 961472 (S.D.Fla. Apr. 9, 2008) (J. Cohn), this Court ruled that lost profits could not be recovered because such loss was not incurred because of interruption of service.

However, the arguments made by TCG regarding two distinct methods of proving loss were not presented in that proceeding.

There is a significant split of authority on this issue, with some courts stating that investigative costs such as TCG has proved herein are "reasonable" costs and are recoverable "loss," while others limit such "loss" to interruption of service, and not mere downloading of documents as in the present case.  Plaintiff relies upon <u>Frees, Inc. v. McMillian</u>, 2007 WL 2264457 (W.D. La. Aug. 6, 2007), and cases cited therein, to support its argument.  <u>See</u> <u>also</u> <u>Nexans Wires, S.A. v. Sark-USA, Inc.</u>, 166 Fed.Appx 559, *2 (2nd Cir. 2006).  Defendant relies upon the decision in <u>Cohen</u>, as well as <u>Resdev, LLC v. Lot Builders Ass'n, Inc.</u>, 2005 WL 1924743 (M.D.Fla. Aug. 10, 2005), which concludes that any "loss" must be as a result of interruption of service.

This issue is a statutory interpretation question.  Although there are no published appellate court decisions, there is a slight lean toward Plaintiff's position based upon the number of cases in which district courts have reached the issue.  This Court, however, concludes that all loss must be as a result of "interruption of service." Otherwise, it would appear that the second half of the "loss" definition is surplusage.  If loss could be any reasonable cost without any interruption of service, then why would there even be a second half to the definition that limits some costs to an interruption of service.  Rather, the better reading (though reasonable minds surely can differ until the Court of Appeals decides the issue) appears to be that all "loss" must be the result of an interruption of service.  This conclusion is supported by the legislative intent in the CFAA, a criminal statute, to address interruption of service and damage to protected

22

computers.

Plaintiff also asserts that the cost of its forensic investigation is "damage" under the CFAA.  The term "damage" is defined as "any impairment to the integrity or availability of data, a program, a system or information." 18 U.S.C. § 1030(e)(8).  Again, there is a split of authority as to whether actual damage must occur.  Plaintiff relies upon HUB Group, Inc. v. Clancy, 2006 WL 208684 (E.D.Pa. Jan. 25, 2006), which simply states that unauthorized access can be damage.  However, Defendants rely upon Condux International v. Haugum, 2008 WL 5244818, *8 (D.Minn., Dec. 15, 2008) which concludes that the plain language of the statute requires "some alteration of or diminution to the integrity, stability, or accessibility of the computer data itself" to be damage under the CFAA.  This Court again agrees with the Defendants, based upon the plain language of the statute that the data must be impaired and not merely copied.

### 3.  Unauthorized Access or Exceeded Authority

In the event the Court's legal interpretation of the jurisdictional amount is incorrect, and because the parties have fully briefed the issues and developed a factual record for purposes of the preliminary injunction, the Court will reach the remaining CFAA issues.  Defendants allege that Plaintiff cannot show that Kravit exceeded her authority to access files that she already had access to for her job.  The evidence shows that although Plaintiff's computer system had tiered levels of access policed by use of usernames and passwords, Plaintiff's access level was high enough to be able to access all the files she is accused of downloading.  There was some testimony that some of the data was outside her geographic scope of her job duties, but not

23

apparently above her computer access level.

Plaintiff has a stronger argument that Kravit exceeded her authority under TCG's written policies to access certain files after she began negotiating with KW for a new position.  There is another split of authority as to whether a person who already has access exceeds their authority as defined in the CFAA when merely copying files from their work computer. 18 U.S.C. § 1030(e)(6) (the term "exceeds authorized access" means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter.").

Defendants rely upon Bridal Expo, Inc. v. van Florestein, 2009 WL 255862, *9-11, (S.D.Tex. Feb. 3, 2009) and Condux International, 2008 WL 5244818 at *4.  These decisions conclude that Congress' plain language put the emphasis on the "use" of the access, such as mere downloading, rather than the "intent" of the departing employee or any implied "duty" of fair dealing.  Plaintiff relies upon International Airport Centers, LLC v. Citrin, 440 F.3d 418, 420-21 (7th Cir. 2006) and Hewlett-Packard Co. v. Byd:Sign, Inc., 2007 WL 275476 (E.D.Tex. Jan. 25, 2007).  These cases stand for the proposition that once an employee is working for himself or another, his authority to access the computer ends, even if he or she is still employed at the present employer.

TCG argues that Defendants' cases can be distinguished because it is the written computer access policies maintained by Plaintiff in its Employee Handbook that determine whether Kravit exceeded her authority to access.  Plaintiff's Exhibit 136.  In this case, those policies state that the computers "are provided for business use," and any equipment is provided "to be used solely for the Company's [TCG's] purposes."

This Court concludes that Plaintiff has shown a substantial likelihood of success that Defendant Kravit did exceed her authorization in downloading various files identified in ¶¶ 17-27 above.  Though the district court decisions on this issue are in dispute, an employer such as TCG clearly has a right to control and define authorization to access its own computer systems.  In this case, the cases cited by Defendants can be distinguished because Plaintiff has shown that Kravit downloaded files that she did not need for her remaining business purposes for TCG during a time when she was actively negotiating to leave TCG and be employed by KW (and, during a time when KW's principals clearly believed Kravit was coming to work for them).

### 4.   "Fraud" in CFAA not properly plead

Defendants also seek dismissal of the § 1030(a)(4) claim because Plaintiff did not plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure and the claim is barred by the Economic Loss Rule.  Plaintiff argues that Rule 9(b) does not apply to the CFAA claim because this claim is not a typical fraud claim subject to Rule 9(b), and, even if the Economic Loss Rule applies, this claim is an independent statutory claim from the breach of contract claim.  As to Rule 9(b) one court has held that it does not apply.  P.C. of Yonkers, Inc. v. Celebrations!, 2007 WL 708978, *6 (D.N.J. Mar. 5, 2007).  Plaintiff also asserts that its Complaint does in fact plead Kravit's "fraud" with particularity.

The Court concludes that while Plaintiff has sufficiently plead the claim to withstand Defendants' motion to dismiss on this claim, Plaintiff has failed to show a substantial likelihood of success that Kravit took the computer files "with intent to

defraud" TCG.  Rather, she took the files because she believed they would be useful to her personally in her new position, and therefore by extension, help her new company compete with TCG.

### 5.  Whether Kravit was KW's Agent for Downloads

The KW Defendants challenge Plaintiff's allegations that Kravit was acting as an agent for the KW Defendants when she downloaded information just prior to her departure from TCG.  Defendants argue they had no control over Kravit's actions as she had not started to work for them.

The evidence presented at the evidentiary hearing does not show a direct link that the KW principals directed Kravit to copy any of TCG's files.  Although KW's principals clearly knew that hiring Kravit would give them a competitive edge over TCG, Plaintiff has not shown a substantial likelihood of success on the merits of the CFAA claim that Kravit's downloading of the files was done with the knowledge or even tacit approval of anyone at KW.  Though Kravit may have been an agent of KW regarding the solicitation of TCG's employees, a fact necessary for injunctive relief on the tortious interference claim, Plaintiffs have not made a sufficient evidentiary link to award relief against KW on the CFAA claim.

### D. Plaintiff's Motion for Adverse Inference

Plaintiff seeks an adverse inference that the files taken by Kravit from TCG's computers were taken not in furtherance of TCG business purposes but with the intention to use the information in her new employment with KW, and, that the files

were actually used in Kravit's employment with KW.  Plaintiff asserts it is entitled to this

adverse inference because Kravit last accessed these files after being placed on notice

of this litigation and because she intentionally destroyed metadata evidence relating to

her use of the files after being put on notice that these files were relevant and highly

material to TCG's claims in this case.

This Court concludes that Plaintiff has not met its burden of showing bad faith to

support the extraordinary remedy of an adverse inference.  Penalty Kick Management,

Ltd. v. Coca Cola Co., 318 F.3d 1284, 1294 (11th Cir. 2003).  Although not all of

Defendant Kravit's testimony is fully credible, her testimony regarding her lack of

knowledge that accessing files would destroy metadata embedded within documents on

her portable devices is credible.  Such metadata evidence is not obvious to non-

computer professionals.  Although this lawsuit had just been filed a few days before her

access on February 14, 2009, and her counsel should have been on notice to preserve

all evidence, including electronic evidence, Defendant Kravit's actions at that time do

not rise to the level required for a finding of spoliation of evidence.  Therefore,

Plaintiff's motion for adverse inference is denied.

## E.  Breach of contract and tortious interference claims[5]

On these claims, TCG asserts that Defendants have obtained TCG's valuable

---

[5] Although the Court's conclusion that Plaintiff has failed to prove the jurisdictional amount of $5,000 means Plaintiff's CFAA claim must be dismissed, this Court will exercise supplemental jurisdiction and proceed to rule upon the motion for preliminary injunction regarding the state court claims.  28 U.S.C. § 1367.

confidential information in violation of the restrictive covenant contract between TCG

and Kravit, and that the KW Defendants have tortiously interfered with that contract in

obtaining and using TCG's information.  The specific information alleged to have been

taken by Marcy Kravit, a district manager in the property management business, in the

month prior to her departure from TCG and new employment at KW, is described in the

Findings of Fact above.  Defendants assert that Plaintiff has failed to establish a

legitimate business interest because most of the allegedly confidential information is

commonly known in the industry and is publicly available, in that association boards

routinely release this information received from property managers to any resident who

requests it.  If this information is "confidential," then irreparable injury is presumed.

In Autonation, Inc. v. O'Brien, 347 F.Supp.2d 1299, 1304 (S.D.Fla. 2004), Judge

Dimitrouleas upheld a restrictive covenant.  He stated:

> Under Section 542.335 of the Florida Statutes, restrictive
> covenants are valid if the employer can prove: (1) the existence of one or
> more legitimate business interests justifying the restrictive covenant; and
> (2) that the contractually specified restraint is reasonably necessary to
> protect the established interests of the employer.  North American
> Products Corp. v. Moore, 196 F.Supp.2d 1217, 1228 (M.D.Fla.2002). If
> the employer can establish its *prima facie* case, the burden shifts to the
> employee to show that the restriction is overbroad, overlong, or otherwise
> not reasonably necessary to protect the established interests of the
> employer. Fla. Stat. 542.335(1)(c). Additionally, when the employer
> establishes a legitimate business interest, irreparable injury must be
> presumed and the burden shifts to the employee to establish the absence
> of such injury. Fla. Stat. 542.335(1)(j); North American Products Corp.,
> 196 F.Supp.2d at 1228; Don King Prods., Inc. v. Chavez, 717 So.2d 1094,
> 1095 (Fla. 4th DCA 1998).
>> Pursuant to Florida's statute, "legitimate business interests"
> include: trade secrets, valuable confidential business information,
> substantial relationships with specific prospective or existing customers,
> customer goodwill, and extraordinary or specialized training. Fla. Stat.

28

542.335(1)(b). Moreover, courts are statutorily required to construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement. Fla. Stat. 542.335(1)(h); AutoNation, Inc. v. Maki, 2004 WL 1925479, *3 (Fla.Cir.Ct. Aug. 25, 2004).

In Florida, confidential business information is considered a legitimate business interest that can be protected by a restrictive covenant in an employment contract. New Horizons Computer Learning Centers, Inc. v. Silicon Valley, 2003 WL 23654790, *6 (M.D.Fla. Nov. 12, 2003). However, information that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection. Anich Indus., Inc. v. Raney, 751 So.2d 767, 771 (Fla. 5th DCA 2000) (citing Keel v. Quality Med. Syst., Inc., 515 So.2d 337-38 (Fla. 3d DCA 1987))

Florida Statutes Section 542.335 also defines "legitimate business interest" as including the following: "Valuable confidential business or professional information that otherwise does not qualify as trade secrets," "substantial relationships with specific prospective or existing customers, patients, or clients," "customer, patient, or client goodwill associated with. . . a specific geographic location or a specific marketing or trade area," and "extraordinary or specialized training."

### 1.  Confidential Information

Plaintiff asserts that it has proven that numerous materials taken by Defendant Kravit and used by KW contain valuable confidential business or professional information.  Although viewed in isolation much of this information could be discovered by competitors by contacting condominium associations or industry sources, the Court concludes that the work and labor expended by Plaintiff in compiling the information, whether board contacts in a county, on-site employee checklists, hurricane preparedness, or environmentally related ("green") improvements, plus Plaintiff's

29

judgment as to the inclusion of the selected information, raises the level of the information to valuable confidential business information in their final compiled form.[6] Thus, such compilations are valuable for a business or a competing business.  In this case, KW has benefitted from its receipt, via Kravit, of the compiled information detailed in the Findings of Fact section of this Order.  These compilations have not only saved KW numerous work hours in obtaining the information and in deciding what to include in the contacts lists, checklists, procedures, and other on-site documents, but have instantly made KW's on-site operations appear more professional to the client base of both TCG and KW.  Thus, the information also qualifies as having a legitimate business interest in client goodwill associated with the specific marketing or trade area of property management for condominium associations.  The Court concludes that Plaintiff has shown a substantial likelihood of success on the merits that it has a legitimate business interest in its non-compete, non-solicitation agreement with Defendant Kravit and that Kravit breached the contract by using documents belonging to TCG in her employment with KW.

### 2.  Solicitation of Employees

TCG has also provided sufficient evidence of a breach of the non-solicitation clause of Kravit's contract with TCG by Kravit's provision of resumes of TCG

---

[6]  To draw an analogy from copyright law, compilations can even be copyrightable.  Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 356 (1991), citing 17 U.S.C. § 101 ("A 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. . . .").

employees to KW principals for purposes of KW's hiring of these TCG employees. Paragraph 2.b. of Kravit's contract with TCG prohibits Kravit on behalf of or in conjunction with any competing business from "directly or indirectly, alone or in any capacity, solicit or in any manner attempt to solicit or induce any person(s) employed by Continental to leave such employment." TCG has shown a legitimate business purpose for this prohibition under Fla. Stat. § 542.335 due to the loss of goodwill of clients by having TCG on-site property managers switch to KW. Property managers are the on-site representatives at these condominium buildings who develop positive relationships with the governing boards of the condominium, a critical consideration when these governing boards vote to extend or terminate a management contract.

Kravit testified that she never initiated contact with any of her former TCG colleagues or subordinates. However, the documents obtained from Kravit and KW's computers show that Kravit actively participated in forwarding resumes of TCG employees to the KW principals for purposes of KW hiring away these TCG employees. See ¶¶ 36-38, *infra*. The Court concludes that Plaintiff has shown a substantial likelihood of success that Kravit breached her contract with TCG by indirectly soliciting TCG employees.

### 3.  Tortious Interference by KW

KW argues that as a non-party to Kravit's contract, it cannot be held liable without Plaintiff proving the elements of a tortious interference claim. "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing

the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract (citing to Restatement). . . ." <u>Gossard v. Adia Services, Inc.</u>, 723 So.2d 182, 184 (Fla. 1998), (citing <u>Ethan Allen, Inc. v. Georgetown Manor, Inc.</u>, 647 So.2d 812, 814 (Fla.1994)); <u>International Sales & Service, Inc. v. Austral Insulated Products, Inc.</u>, 262 F.3d 1152, 1154 (11th Cir. 2001).

Turning first to the claim in Count IV that KW interfered with the non-compete contract between Kravit and TCG, it is clear that KW hired Kravit with knowledge that she was a party to a non-compete, non-solicitation contract with TCG.  KW engaged in a month-long contract negotiation with Kravit while she was still employed at TCG, with full knowledge of her agreement with TCG.  As described above, this contract had a legitimate business interest.

The KW Defendants argue that the restriction on Kravit's employment is overbroad, overlong, or otherwise not reasonably necessary to protect the established interests of TCG.  The contract as written would ban Defendant Kravit from working in property management in Florida for two years.  While the Court will reduce these restrictions, the KW Defendants have not shown that some ban on their employment of Kravit is unreasonable.   TCG has already shown how enforcement of its contract is necessary to protect its interests in TCG's compilations of information that Kravit took from TCG and brought to KW, benefitting KW at the expense of TCG.

Kravit and the KW Defendants took a chance that the TCG contract would not be enforced.  The Court concludes that Plaintiff has shown a substantial likelihood of

success on the merits of its claim that KW Property Management, Inc. tortiously

interfered with the Kravit-TCG contract for Kravit not to compete with TCG.

With respect to solicitation of employees, KW argues that it never induced any

TCG employees to leave TCG and work for KW.  However, TCG need only prove that

KW induced Kravit to breach her contract with TCG.  On this issue the evidence shows

that KW did induce Kravit to forward resumes of TCG employees to KW's principals

(Mssrs. Kaplan, White and Cox), which computer metadata evidence shows Kravit

obtained while still working at TCG, a fact that had to have been known by the KW

principals.  These TCG employees were clearly brought to the attention of KW's

principals for purposes of hiring those individuals to work for KW to further KW's

business interests at the expense of TCG.  See ¶¶ 36-38, infra.  There is also evidence

that certain former TCG employees now work for KW.  Id.  The Court therefore

concludes on the record before it that TCG has shown by a substantial likelihood of

success on the merits that KW did induce such a breach by Kravit of the non-

solicitation provisions in the agreement.[7]

### 4.  Other Contract Defenses

Defendant Kravit makes additional arguments that the contract she signed at the

beginning of her employment was no longer valid at the time she left in December of

---

[7]  The Court also concludes that of the KW entities listed as Defendants, there is no credible evidence linking Defendants KW Holding One, LLC and The Grand Preserve at Naples, LLC to Marcy Kravit's actions or the property management business of KW Property Management, Inc.  Therefore, these Defendants are dismissed from this action.  Any further reference to "KW" refers only to KW Property Management, Inc.

2008.  First, she asserts that because TCG breached her agreement or had unclean hands due to Kravit's negative treatment by TCG in the "mezuzah incident" in March of 2007, TCG can no longer enforce the agreement.  The Court disagrees.

The equitable doctrine of "unclean hands" provides that: "one who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law."  Matter of Garfinkle, 672 F.2d 1340, 1346, n.7 (11th Cir. 1982), (quoting Peninsula Land Co. v. Howard, 6 So.2d 384, 389 (Fla. 1941)).  Although TCG may have been unfair in not allowing Kravit to publicly clear her name in that she personally opposed the condominium board's decision to direct a resident to remove a mezuzah, this incident, occurring over 18 months prior to the events which gave rise to this lawsuit, did not rise to the level of unclean hands so as to deny the present claim by TCG for breach of contract.

Another defense Kravit asserts is that the contract terminated in March of 2007 due to her resignation at that time.  However, the evidence is clear that Kravit was promoted by TCG before the termination date that Kravit herself set in her resignation letter.  Thus, her employment continued under the initial agreement.

A third defense invoked by Kravit is that since TCG never conducted an exit interview with her in December of 2008, pursuant to TCG's employment policies, TCG waived any claim to those materials, and, Kravit had no notice what "confidential" materials she was supposed to return.  Although the TCG's employment policies do state that exit interviews shall occur, the failure to conduct an exit interview does not

trump the specific language in the parties' contract that Kravit had an affirmative

obligation to return "any and all information, materials, or equipment in whatever form,

that constitutes, contains, or relates in any way to Confidential Information . . . ."

Plaintiff's Exhibit 132, ¶ 1c.[8]  Therefore, none of the defenses posed by Defendant

Kravit forestall the provision of a remedy for breach of contract.

## F.  Remaining Preliminary Injunction Elements

Having found that Plaintiff has a substantial likelihood of success on the merits

of its breach of contract against Defendant Kravit, the Court turns to the other elements

required for issuance of a preliminary injunction.

### 1.  Irreparable Harm

For violations of a covenant not to compete or solicit in compliance with Florida

Statutes Section  542.335, upon a showing of legitimate business interest as in this

case, irreparable harm is presumed, though Defendants can rebut this presumption.

As discussed above, Plaintiff has shown that the compilation of otherwise publicly

available information can be protected as confidential information and the solicitation of

TCG employees harms client goodwill.  Defendants argue that Plaintiff has not shown

the threat of further harm.  However, the retention of the information taken by Kravit

and given to KW does provide a threat of future harm to TCG, albeit KW has agreed to

---

[8]  As a corollary argument, Kravit asserts that because TCG never requested
return of materials when she resigned in March of 2007, she had no reason to believe
she had a duty to return them in December, 2008.  As noted above, Kravit never left
TCG's employment in March of 2007.

not use any of the TCG information and not solicit any employees.  The Court

concludes that Defendants have not rebutted the presumption of irreparable harm.

## 2.  Balance of the Harm to the Parties

Defendants argue that TCG cannot (as of yet) quantify any measurable

damages due to loss of any clients, yet they seek to ban Marcy Kravit from working in

Florida in her chosen field for a period of two years.  While the Court acknowledges

that Marcy Kravit would be harmed by such a remedy, it is Defendant Kravit who

breached her contract with TCG and provided TCG's competitor, KW, with large

amounts of useful information for KW to systematically take over TCG's clients.  This

information includes pricing of product (burden rates), employee retention (TCG

employee salary information), and client contact lists (board president information).

The nature of the property management business is such that clients typically cannot

immediately change management companies but must wait for the contract to come up

for renewal.  The Court does not find that TCG must wait until their client contracts are

not renewed before seeking injunctive relief against a former employee and her new

employer for clear breaches of a contract not to compete, solicit clients or employees,

or take confidential information.  Thus, some injunctive relief is necessary to enforce

the contracts.

## 3.  Public Interest

Defendants assert that restraining competition between KW and TCG will injure

the public at large.  While this statement is true, the public interest also requires

36

adherence to contracts and fair competition.  In this case, the employment of Kravit by KW, a direct competitor of TCG, along with the many TCG work-product documents brought by Kravit to KW and used by KW to improve their services, all done in violation of the Kravit-TCG contract, requires injunctive relief to remedy these breaches that does outweigh the public interest in business competition.

## G.  Injunctive Relief

Defendants assert that the injunctive relief sought by Plaintiff is overbroad, as TCG seeks enforcement of a restriction in every county in Florida where it operates, which encompasses most of the state, even though Marcy Kravit only worked in Broward and Miami-Dade counties.  In addition, KW asserts that there is no evidence of KW's involvement of Kravit's downloading of TCG information warranting a remedy that the KW computers be "wiped clean."  The Court agrees.

As to injunctive relief against Defendant Marcy Kravit, Defendant Kravit shall be enjoined from competing with TCG by engaging in property management and/or maintenance services in Miami-Dade, Broward or Palm Beach counties from now through December 11, 2010.  The Court concludes that limiting the restriction to the three counties in South Florida is reasonable, while enforcing a state-wide ban is not reasonable.  Nearly all of the location specific information that Kravit took from TCG relates to properties in these three counties.  Though the more general information (hurricane preparedness, green initiatives and on-site checklists) would be applicable state-wide, the Court finds that enforcement within the three South Florida counties is a

stern, but appropriate remedy at this preliminary injunction stage.  Defendant Kravit worked in both Miami-Dade and Broward counties for TCG, and had in her possession a list of most of TCG's client contacts for Palm Beach County.[9]

The remaining portions of the preliminary injunctive relief ordered by the Court comport with the relief agreed to by the KW Defendants in their response to Plaintiff's Motion for Preliminary Injunction.  See pp. 2-4 of Defendant's Response to Plaintiff's Motion for Preliminary Injunction [DE 58].  Thus, Defendants KW Property Management, Inc. and Marcy Kravit, individually and collectively, together with their respective officers, agents, servants, employees, attorneys, accountants, and all persons acting in concert with them or under their inducement, encouragement or persuasion, are enjoined and restrained from performing any of the following acts, directly or indirectly, on their own behalf or on behalf of any third party:

a.    retaining any confidential, proprietary or valuable information belonging to Plaintiff that is stored or maintained in tangible form (including computer files, CDs, electronic files on removal media, or in any other electronic form, and hard copy documents) and instead returning all such documents, computer files and other data to Plaintiff;

b.    using or causing to be used, or disclosing in any manner, any electronically-stored information obtained from the Plaintiff, including without limitation client

---

[9]  As to the temporal scope of the injunction, to the extent Plaintiff seeks the two year period to begin now, as opposed to back when Kravit left the employ of Plaintiff on December 11, 2008, the Court concludes that re-starting the two year period would be overbroad.

and prospective client information, financial information, personal identifying information, employee information, and information relating to or regarding Plaintiff's business;

c.  modifying, deleting, altering, or destroying any of Plaintiff's files, documents or data obtained or removed from Plaintiff, or reflecting information accessed at or obtained from Plaintiff, including any confidential or valuable information, and including documents or other evidence reflecting the removal, use or disclosure of any confidential information, including but not limited to printed documents and documents or data in any electronic format, however, stored, including any type of computer, disk, storage device or otherwise, or destroying evidence of the transfer, copying, use or disclosure of such information;

d.  for a period of two years, contacting any of TCG's clients for the purpose of diverting, soliciting, negotiating or contracting for property management or maintenance services (TCG to file a sealed list of such clients as they existed on December 11, 2008);

e.  for a period of two years, soliciting or attempting to solicit or induce any TCG employee to leave TCG's employment;

f.  for a period of two years, diverting, soliciting, or taking away any client of TCG for the purpose of selling property management or maintenance services

IV.  CONCLUSION

Based upon the foregoing factual findings and legal analysis, it is **ORDERED AND ADJUDGED** as follows:

1.      Plaintiff's Motion for a Preliminary Injunction  [DE 3] is hereby **GRANTED in part** as to Counts II and IV, as explained above, and **DENIED** as to Count I and III (the later without prejudice);

2.      Defendants' Motion to Dismiss [DE 57] is hereby **GRANTED** as to the CFAA claim in Count I and **DENIED** as to the other claims;

3.      Defendants' Motion to Dismiss [DE 57] is **GRANTED** as to Defendants KW Holding One, LLC and The Grand Preserve at Naples, LLC;

4.      Plaintiff's Motion to Strike Affidavit [DE 100] is hereby **DENIED** as moot;

5.      Plaintiff's Motion for Adverse Inference or Injunction due to Spoliation [DE 102/104] is hereby **DENIED**;

6.      Plaintiff's Motion to Amend and Supplement Preliminary Injunctive Relief [DE 128] is hereby **GRANTED**, only to the extent that the Court considered such injunctive relief;

7.      Plaintiff's Motion to Strike Supplemental Memorandum [DE 146] is hereby **GRANTED.**

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 22nd day of April, 2009.

_James I. Cohn_
JAMES I. COHN
United States District Judge

Copies furnished to:
Counsel of record via CM/ECF